[Cite as *State v. Deaton*, 2026-Ohio-2654.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                    :

    Appellee,                :

vs.                            :

TYLER WAYNE DEATON,       :

    Appellant.              :

                                :

CASE NO. CA2025-10-098

OPINION AND
JUDGMENT ENTRY
7/13/2026

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 24CR42060

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Kidd & Urling LLC, and Thomas W. Kidd, Jr., for appellant.

## **O P I N I O N**

**SIEBERT, J.**

{¶ 1} Appellant, Tyler Deaton, appeals his convictions in the Warren County Court of Common Pleas for endangering children and felonious assault. On appeal, Deaton challenges both the weight of the evidence supporting his convictions and the trial

court's sentencing decision. We find no merit as to Deaton's arguments concerning the weight of the evidence, nor in the trial court's consideration as to the sentencing factors for the offense. However, we find the trial court failed to make the necessary consecutive sentencing findings. Therefore, we affirm in part, reverse in part, and remand this matter for resentencing.

## I. Facts and Procedural History

## A. The Incident and Adam's Injuries

{¶ 2}    On July 14, 2024, "Adam" resided in a trailer in Warren County, Ohio, with his "Mother," Deaton, and his three-year-old half-brother, "Bain."[1] Throughout the day, Adam remained in Mother's care and appeared healthy, active, and developmentally normal. Mother fed and bathed Adam while she photographed and video recorded him to commemorate his six-month "birthday," capturing images of a smiling, alert infant.

{¶ 3}    Deaton finished work at approximately 6:00 p.m. and arrived home around 6:30 p.m. He then drove the family to a nearby restaurant so Mother could begin her work shift. After dropping Mother off, Deaton returned home with Adam and Bain, becoming the children's sole caregiver. Deaton's father ("Grandfather") was expected to arrive later that evening to assist with plumbing issues.

{¶ 4}    At approximately 7:00 p.m., before Grandfather arrived, Deaton called Grandfather in a frantic state and reported that Adam had fallen from the couch and was "not breathing properly." Grandfather arrived within ten to 15 minutes and found Adam lying on the couch, breathing irregularly and appearing to be in distress. After unsuccessfully attempting to console him, Grandfather transported Adam to Bethesda

---

1. "Adam" and "Bain" are pseudonyms adopted in the opinion for purposes of privacy and readability. *In re A.M.*, 2023-Ohio-1523, ¶ 1, fn. 1 (12th Dist.); The Supreme Court of Ohio Writing Manual, § 16, at 115 (3d. Ed. 2024).

Arrow Springs Hospital.

{¶ 5} Upon arrival at Bethesda Arrow Springs, Grandfather informed medical personnel that Adam had "slid off the couch and hit the floor." Mother arrived shortly thereafter and observed Adam drifting in and out of consciousness and struggling to breathe.

{¶ 6} Medical personnel quickly determined that Adam's condition was critical. He presented with a low heart rate, unresponsiveness, seizures, and unstable blood pressure and respiratory function. Suspecting significant head trauma, physicians arranged for Adam's emergency transfer to Cincinnati Children's Medical Center.

{¶ 7} Mother informed medical staff that Adam had been normal, active, and symptom-free while in her care earlier that day. Diagnostic imaging revealed extensive intracranial injuries, including a large left subdural hemorrhage compressing the frontal lobe, subarachnoid hemorrhages, bridging-vein thrombosis, and a retroclival hematoma. An ophthalmologic examination further revealed bilateral grade-three vitreous hemorrhages with additional retinal involvement. Medical experts concluded that Adam's injuries were inconsistent with a short fall from a couch and instead were indicative of rapid acceleration–deceleration trauma.

{¶ 8} Despite the severity of Adam's condition, Deaton never entered either hospital. Instead, he remained outside and later claimed that he feared arrest because of an outstanding probation-violation warrant. He also indicated that he believed he had to show a form of identification to enter the hospital and that he did not have one. Text messages admitted at trial reflected Deaton's concern, including one in which he stated, "I'm scared as hell. I don't want to go to jail."

{¶ 9} Detective Brandon Abshear testified that Deaton's failure to accompany Adam into the hospital was unusual given the child's critical condition. During the early

morning hours of July 15, 2024, officers located Deaton at a friend's residence. After announcing their presence and receiving no response, officers discovered Deaton hiding beneath a pile of laundry in a closet. He was arrested on the outstanding warrant.

{¶ 10} During a subsequent interview with law enforcement, Deaton maintained that Adam had "rolled off the couch and basically fell on the ground."

{¶ 11} Adam remained hospitalized until August 5, 2024. At the time of discharge, he required tube feeding and continued treatment for complications associated with a traumatic brain injury. Although Adam survived, he suffered permanent brain damage and irreversible vision loss.

## B. Indictment and Bench Trial

{¶ 12} A Warren County Grand Jury indicted Deaton on one count of felonious assault and one count of endangering children. Deaton pled not guilty, and the matter proceeded to a bench trial.

### i. The State's Evidence

{¶ 13} The State presented testimony from Mother, Grandfather, and two Warren County detectives regarding the events surrounding Adam's injuries and the ensuing investigation. The State also introduced expert medical testimony establishing that Adam's injuries could not have resulted from the situation described by Deaton.

{¶ 14} Dr. Pratima Shanbhag, a child-abuse pediatrician at the Mayerson Center at Cincinnati Children's Medical Center, testified that Adam suffered subdural hemorrhages, retinal hemorrhages, and extensive brain trauma caused by significant shearing forces that tore bridging veins within the brain. According to Dr. Shanbhag, such injuries are inconsistent with normal childhood activity or minor falls, including a short fall from a couch. Instead, she explained that the injuries were consistent with severe trauma, such as that sustained in a motor vehicle collision or abusive head trauma involving

shaking, impact, or both.

{¶ 15} Dr. Shanbhag supported her conclusions with diagnostic imagining. A CT scan revealed a retroclival hematoma indicative of a neck injury, while an MRI disclosed extensive subdural bleeding along the spinal canal and injury to multiple regions of the brain, including the cerebellum. Based on these findings, Dr. Shanbhag concluded that Adam's injuries resulted from abusive head trauma involving rapid acceleration-deceleration forces. She ruled out accidental, congenital, and other nontraumatic causes.

{¶ 16} Dr. Marguerite Care, a pediatric neuroradiologist, corroborated Dr. Shanbhag's conclusions. Dr. Care testified that Adam's spinal subdural hemorrhage is rarely seen in accidental trauma, even in serious cases, and is more commonly associated with abusive head trauma. While she acknowledged that Adam had no external bruising, she testified that such bruising is not always present in infants suffering this type of trauma. She characterized Adam's injuries as presenting the "classic imaging findings" of abuse and opined that they required a degree of force comparable to that involved in significant accidents rather than a short household fall. In her opinion, Adam's injuries were "out of proportion" to any reported minor fall.

{¶ 17} Dr. Shanbhag and Dr. Care reviewed the report and conclusions of Deaton's expert, Dr. Scheller, which are discussed in the next section of this opinion. Their testimony directly contradicted Dr. Scheller's conclusions in extensive, scientific detail. Further, both experts testified that Adam would have exhibited symptoms almost immediately after sustaining the injuries. Dr. Shanbhag explained that Adam would not have been capable of eating, sitting upright, smiling, tracking movement, or otherwise interacting normally after the injuries occurred. Because Adam was observed engaging in those activities while in Mother's care earlier that day, Dr. Shanbhag concluded that Mother was not responsible for the injuries. Dr. Care similarly testified that Adam would

have appeared lethargic, intermittently unconscious, and in respiratory distress shortly after the traumatic event occurred. She concluded that the injuries were inflicted after Adam was last observed behaving normally and shortly before he arrived at Bethesda Arrow Springs.

**ii. The Defense Evidence**

{¶ 18} Deaton testified in his own defense. He stated that after finishing work, he drove Mother to her job, returned home with the children, and placed Adam on a donut pillow on the couch with a propped bottle. According to Deaton, he briefly stepped outside to retrieve Bain from the vehicle. When he returned, he found Adam wedged vertically between the couch and a nearby bassinet, grunting and breathing irregularly. Deaton denied ever shaking, striking, or dropping Adam. When asked if anything could provoke him to anger or cause him to lose control, he responded that nothing would, describing himself as a "very calm guy."

{¶ 19} Deaton also addressed his failure to enter the hospital, explaining that he remained outside because he was afraid of being arrested for a probation violation. He further denied hiding from law enforcement or concealing himself in a closet when officers arrived to arrest him.

{¶ 20} The defense also presented testimony from Dr. Joseph Scheller, a neurologist. Dr. Scheller testified that a diagnosis of abuse or abusive head trauma requires the exclusion of reasonable medical alternatives, which he believed had not occurred in Adam's case. He noted that Adam's medical records reflected accelerated head growth and excess extra-axial fluid, conditions that could predispose an infant to subdural bleeding even in the absence of significant trauma. Dr. Scheller opined that Adam sustained some unidentified trauma at birth, which caused him to develop a subdural hydroma, leading to a venus thrombosis, which led to Adam becoming suddenly

ill at six months, triggering a seizure and his other injuries. The record contains no evidence beyond Dr. Scheller's report and testimony that Adam suffered any trauma at birth; rather, evidence supports that Adam's birth was documented as normal, healthy, and medically unremarkable. Dr. Scheller further testified that he did not observe imaging findings consistent with classic shearing injuries. In addition, he opined that Adam's retinal hemorrhages were more likely secondary to brain and vascular injuries than indicative of abusive trauma.

### iii. Verdict and Sentence

{¶ 21} Following the presentation of evidence, the trial court found Deaton guilty of felonious assault and child endangering. The court merged the offenses for purposes of sentencing, and the State elected to proceed on the felonious assault conviction. The trial court then imposed an indefinite prison term of six to nine years, to be served consecutively with the prison sentence imposed for a probation violation in a separate case.

{¶ 22} Deaton now appeals, raising three assignments of error for review.

### II. Appeal

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 23} In his first assignment of error, Deaton argues that his convictions for felonious assault and endangering children are not supported by sufficient evidence and are against the manifest weight of the evidence. Specifically, he contends that the State failed to prove that he knowingly or recklessly caused Adam's injuries. Deaton emphasizes that no witness observed him strike, shake, or otherwise abuse the child and maintains that the testimony of the defense expert provided a reasonable alternative explanation for Adam's injuries.

{¶ 24} As an initial matter, Deaton's conviction for endangering children merged

with his conviction for felonious assault, and the State elected to proceed on the felonious assault charge. Because the trial court did not impose a sentence for the endangering children offense, that finding of guilt does not constitute a separately reviewable final appealable order and is therefore not subject to review in this appeal. Accordingly, our analysis is limited to Deaton's conviction for felonious assault. *See State v. Jones*, 2026-Ohio-68, ¶ 33 (12th Dist.), citing *State v. Sperry*, 2025-Ohio-2626, ¶ 39 (12th Dist.).

{¶ 25} The concepts of sufficiency of the evidence and weight of the evidence are legally distinct. *State v. Wright*, 2014-Ohio-985, ¶ 10 (12th Dist.). Nevertheless, a determination that a conviction is supported by the manifest weight of the evidence is also dispositive of any claim regarding sufficiency. *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.); *State v. Hart*, 2012-Ohio-1896, ¶ 43 (12th Dist.).

{¶ 26} In considering a manifest weight challenge, the reviewing court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice requiring reversal and a new trial. *State v. Marcum*, 2025-Ohio-1122, ¶ 11 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id*.

{¶ 27} It is well established that circumstantial evidence and direct evidence have the same probative value, and a conviction may rest entirely on circumstantial evidence. *State v. Saunders*, 2013-Ohio-2052, ¶ 44 (12th Dist.); *State v. Ortiz–Bajeca*, 2011-Ohio-3137, ¶ 20 (12th Dist.).

{¶ 28} In this case, Deaton was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly . . . cause serious physical harm to another." There is no dispute that Adam suffered serious physical harm;

rather, Deaton challenges whether the evidence supports the finding that he was the one who knowingly caused those injuries.

{¶ 29} Upon review, we conclude that Deaton's convictions are supported by the manifest weight of the evidence. The State presented substantial medical evidence establishing that Adam suffered severe and life-threatening injuries consistent with abusive head trauma. Both Dr. Shanbhag and Dr. Care testified that Adam's injuries—including extensive intracranial bleeding, retinal hemorrhaging, and traumatic brain injury—required significant force and were inconsistent with a short fall from a couch. Both experts further testified that Adam would have exhibited symptoms almost immediately after sustaining injuries and would have been incapable of engaging in normal infant behavior thereafter.

{¶ 30} The evidence established that Adam appeared healthy, alert, and developmentally normal while in Mother's care earlier that day. The testimony further demonstrated that Adam began exhibiting severe symptoms only after he was left in Deaton's exclusive care. Based on this evidence, the trial court reasonably concluded that Adam sustained his injuries during the period in which Deaton was the sole caregiver.

{¶ 31} Although Deaton denied harming Adam and presented testimony from Dr. Scheller suggesting that Adam's injuries could have resulted from an alternative medical condition, the trial court was entitled to evaluate the credibility of the witnesses and resolve conflicts in the evidence. *State v. Young*, 2018-Ohio-701, ¶ 67 (12th Dist.). As the trier of fact, the court was free to credit the testimony of the State's experts and reject Dr. Scheller's opinions. The mere existence of competing expert testimony does not render a conviction against the manifest weight of the evidence.

{¶ 32} Nor does the absence of eyewitness testimony undermine the verdict. Circumstantial evidence alone may support a criminal conviction, particularly in cases

involving infant victims who are incapable of describing the events that caused their injuries. *State v. Villarreal*, 2005-Ohio-1924, ¶ 30 (12th Dist.). Here, the medical evidence, the timing of Adam's symptoms, and the fact that Adam was in Deaton's exclusive care when the injuries occurred provided compelling circumstantial evidence of Deaton's guilt. After considering the evidence presented, the trial court specifically found that Deaton's explanation "lack[ed] credibility" and was "not consistent with the science," implicitly rejecting the testimony of Deaton's expert. The trial court eliminated the possibility that Adam's injuries were accidental or from a short fall. The trial court concluded that the evidence supported beyond a reasonable doubt that Deaton caused the serious physical harm to Adam.

{¶ 33} After reviewing the entire record, we find no basis to conclude that the trial court lost its way or created a manifest miscarriage of justice in finding Deaton guilty. Accordingly, Deaton's convictions are not against the manifest weight of the evidence. Because the convictions are supported by the manifest weight of the evidence, they are necessarily supported by sufficient evidence as well. *Jones*, 2013-Ohio-150, at ¶ 19 (12th Dist.).

{¶ 34} Deaton's first assignment of error is overruled.

**B. Sentencing**

{¶ 35} In his second and third assignments of error, Deaton argues that the trial court erred by ordering his sentence to be served consecutively to the sentence imposed for his probation violation and by failing to properly consider the applicable sentencing factors.

{¶ 36} A felony sentence is reviewed under the standard in R.C. 2953.08(G)(2). *Jones*, 2026-Ohio-68, at ¶ 74 (12th Dist.). Under that statute, an appellate court may modify or vacate a sentence if it finds by clear and convincing evidence that the record

does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law. *State v. Gable*, 2024-Ohio-293, ¶ 8 (12th Dist.).

### i. Consecutive Sentencing Findings

{¶ 37} The trial court ordered Deaton's sentence in this case to be served consecutively to the prison term imposed following the revocation of his community control. Deaton argues that the court failed to make all of the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences.

{¶ 38} A sentence is contrary to law when the trial court fails to make the consecutive sentencing findings required by R.C. 2929.14(C)(4). *State v. Wood*, 2020-Ohio-422, ¶ 9 (12th Dist.). Those findings are required when a trial court revokes community control and imposes multiple prison terms. *State v. Howard*, 2020-Ohio-3195, ¶ 27.

{¶ 39} Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *Id*. Specifically, the trial court must find that (1) the consecutive sentence is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) one of the factors set for in R.C. 2929.14(C)(4)(a), (b), or (c) applies.

{¶ 40} As relevant here, R.C. 2929.14(C)(4)(c) permits the imposition of consecutive sentences when "[t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

{¶ 41} The required findings must be made at the sentencing hearing so that the offender and counsel are provided notice of the basis for the sentence. *State v. Bonnell*,

2014-Ohio-3177, ¶ 29. Nevertheless, a trial court is not required to recite the statutory language verbatim, and consecutive sentences will be upheld so long as the reviewing court can discern that the trial court engaged in the proper analysis and the record supports its findings. *Id*.

{¶ 42} In imposing consecutive sentences, the trial court stated:

> With regard to the probation violation, I'm going to impose fourteen months in prison, with credit for 420 days already served in that case. I will close that case. I am going to make a consecutive-sentence finding, if necessary, I don't think it's necessary, but these sentences will run consecutively because a consecutive sentence is necessary to properly punish you and protect the public, and the overall sentence is not disproportionate to the conduct involved or the danger you pose.

{¶ 43} Although the trial court later stated in its sentencing entry that Deaton's criminal history demonstrated that consecutive sentences were necessary to protect the public from future crime pursuant to R.C. 2929.14(C)(4)(c), no such finding was made during the sentencing hearing.

{¶ 44} Deaton argues that the sentencing hearing contains no finding addressing his criminal history, despite the language included in the sentencing entry. The State responds that the trial court effectively made the necessary finding when it stated that consecutive sentences were necessary to punish Deaton and protect the public.

{¶ 45} Upon review, we agree with Deaton. The trial court's comments at the sentencing hearing satisfy the first two findings required by R.C. 2929.14(C)(4). However, nothing in the court's remarks indicates that it found Deaton's criminal history demonstrated that consecutive sentences were necessary to protect the public from future crime, as required by 2929.14(C)(4)(c).

{¶ 46} Although the court referenced Deaton's probation violation and stated that consecutive sentences were necessary to punish him and protect the public, it never

connected that determination to Deaton's criminal history. Nor did it otherwise make any findings corresponding to R.C. 2929.14(C)(4)(a) or (b). As this court recently held, R.C. 2929.14(C)(4)(c) requires a finding that the offender's *criminal history* demonstrates that consecutive sentences are necessary to protect the public from future crime. *State v. Evans*, 2026-Ohio-1237, ¶ 98 (12th Dist.).

{¶ 47} The Ohio Supreme Court has emphasized that, while the sentencing court need not employ "talismanic" words, a reviewing court must nevertheless be able to discern that the trial court engaged in the correct analysis. *State v. Bonnell*, 2014-Ohio-3177, ¶ 29, 37. Here, the trial court's statement that consecutive sentences were necessary to punish Deaton and protect the public were made in connection with the required predicate findings under R.C. 2929.14(C)(4), not as a finding that Deaton's criminal history demonstrated the necessity of consecutive sentences. Indeed, the court did not mention Deaton's criminal history when imposing consecutive sentences. At best, we are left to speculate whether the trial court relied upon Deaton's criminal history in reaching its decision. As we observed in *Evans*, "[t]hat guesswork is precisely what *Bonnell* forecloses." *Evans* at ¶ 95.

{¶ 48} Because the trial court failed to make the third finding required by R.C. 2929.14(C)(4)(a), (b), or (c) at the sentencing hearing, the imposition of consecutive sentences is contrary to law. *See Bonnell* at ¶ 37. Accordingly, Deaton's second assignment of error is sustained.

**ii. Statutory Sentencing Factors**

{¶ 49} Deaton also argues that the trial court failed to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors contained in R.C. 2929.12. We find no merit to this argument.

{¶ 50} Deaton was convicted of felonious assault, a second-degree felony. The

- 13 -

applicable statutory range for that offense is an indefinite prison term consisting of a minimum term of two to eight years and a maximum term calculated pursuant to R.C. 2929.144. *See* R.C. 2929.14(A)(2)(a) and 2929.144(B)(1). The trial court imposed an indefinite sentence of six to nine years, a sentence that falls within the authorized statutory range.

{¶ 51} Although the trial court did not explicitly reference R.C. 2929.11 or 2929.12 during the sentencing hearing, this court has consistently held that a sentencing court is not required to do so. *State v. Julious*, 2016-Ohio-4822, ¶ 11 (12th Dist.); *State v. Peck*, 2016-Ohio-1578, ¶ 9 (12th Dist.). A statement in the sentencing entry that the court considered the applicable statutes is sufficient. *Julious* at ¶ 11.

{¶ 52} The sentencing entry in this case expressly states that the trial court considered the record, the arguments of counsel, the statements of the parties, the mitigation evidence, the presentence investigation, the victim impact, and the purposes and principles of sentencing under R.C. 2929.11, as well as the seriousness and recidivism factors set forth in R.C. 2929.12.

{¶ 53} The trial court's comments at the sentencing hearing likewise reflect an individualized consideration of the appropriate sentence:

> Mr. Deaton, you and I are both in a difficult position here. This is a very serious charge—felonious assault and child endangering. It would be easy to impose the maximum sentence in every case involving harm to a child, especially where the offender was on probation. But that is not my role. My role is to determine the appropriate sentence in this particular case. Among those who commit this type of offense, I must decide where, between two and eight years, the appropriate sentence lies.

{¶ 54} These remarks demonstrate that the trial court considered the seriousness of the offense, Deaton's individual circumstances, and the need to impose a sentence tailored to the facts of the case.

{¶ 55} Accordingly, Deaton has failed to establish by clear and convincing evidence that the record does not support the trial court's findings or that his sentence is otherwise contrary to law. Deaton's third assignment of error is overruled.

### III. Conclusion

{¶ 56} We overrule Deaton's first and third assignments of error. We sustain Deaton's second assignment of error because the trial court failed to make all of the findings required by R.C. 2929.14(C)(4) at the sentencing hearing before imposing consecutive sentences.

{¶ 57} Accordingly, the judgment of the trial court is affirmed with respect to Deaton's conviction but reversed as to the imposition of consecutive sentences. This matter is remanded for resentencing consistent with this opinion.

{¶ 58} Judgment affirmed in part, reversed in part, and remanded.


M. POWELL, J., concurs.

PIPER, J., dissents.


**PIPER, J., dissenting.**

{¶ 59} In assessing a trial court's compliance with R.C. 2929.14(C)(4), we examine: (1) whether the trial court applied the correct analysis, and (2) whether the record contains evidence supporting the trial court's findings. *State v. Vokas*, 2024-Ohio-171, ¶ 12 (10th Dist.). When imposing consecutive sentences, a trial court must make the R.C. 2929.14(C)(4) findings at the sentencing hearing and incorporate them into its sentencing entry, "but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, syllabus.

{¶ 60} If the appellate review can discern that the trial court engaged in the correct analysis and that the record contains evidence supporting the findings, consecutive

sentences should be upheld. *Id*. In this respect, appellate courts have been deferential in reviewing challenges to the trial court's R.C. 2929.14(C)(4) findings and will determine that the trial court made the requisite findings if they reasonably can be gleaned from the record. *Vokas* at ¶ 12.

{¶ 61} I part ways with my respected colleagues because they fault the trial court's findings solely because the trial court "did not mention Deaton's criminal history when imposing consecutive sentences." The majority opinion emphasizes that *criminal history* must be mentioned when protecting the public pursuant to R.C. 2929.14(C)(4)(c). However, while R.C. 2929.14(C)(4)(c) cites an offender's history of criminal conduct as a reason to protect the public, the phrase "criminal history" does not appear anywhere within that statute's otherwise plain language.

{¶ 62} The trial court in this case determined that consecutive sentences were "necessary to properly punish [Deaton]," thereby satisfying R.C. 2929.14(C)(4), and also found that consecutive sentences were necessary to protect the public from Deaton. A finding that public protection is necessary applies to both (C)(4) and (C)(4)(c). The clumsy drafting of R.C. 2929.14(C)(4) creates operational difficulty, which some courts have referred to as "overlap." *See State v. Ison*, 2025-Ohio-3193, ¶ 49 (11th Dist.); *see also State v. White*, 2017-Ohio-7797, ¶ 14 (7th Dist.).

{¶ 63} Failing to discuss the reasons for protecting the public is not grounds for reversal. The reasons are not a resurgence of judicial fact-finding. Whether the reason to protect the public is that the offender posed a danger to the public under R.C. 2929.14(C)(4) or that the offender had a history of criminal conduct pursuant to R.C. 2929.14(C)(4)(c), the two reasons are identical in effect, namely, the need to protect the public. Reasons that necessitate protecting the public from future criminal conduct can, and often do, overlap.

{¶ 64} The Seventh District's decision in *White* is particularly poignant. In *White*, the trial court determined that consecutive sentences were necessary to protect the public from future crime by the offender and also found that consecutive sentences were necessary to protect the public from future crime. "The statute lists these as two separate findings, when one finding clearly encompasses the other . . . Due to this overlap in the language of the statute, it is theoretically possible for a trial court to make the appropriate findings, even without tracking the precise language of the statute." *Id.* at ¶ 12. This same reasoning applies here.

{¶ 65} In construing the verb "find," the Ohio Supreme Court explained that "a finding means only that 'the [trial]court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *Bonnell*, 2014-Ohio-3177, at ¶ 26, quoting *State v. Edmonson,* 1999-Ohio-110, ¶ 9. *Bonnell* recognized that while a limited number of statutes require a trial court to give reasons in support of its findings, "no statute directs a sentencing court to give reasons supporting imposition of consecutive sentences." *Id.* at ¶ 27. Consecutive sentences should be upheld "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings." *Id.* at ¶ 30.

{¶ 66} This court has held that, despite the trial court's failure to use the exact statutory language at the defendant's sentencing hearing, the record and the trial court's oral statements at sentencing supported imposing consecutive sentences. *State v. Hollon*, 2025-Ohio-2725, ¶ 47-48 (12th Dist.). We should have done the same in this appeal. We also noted in *Hollon* that the defendant did not argue that the record failed to support the trial court's consecutive-sentence findings under the statute. Again, we could have said the same in this appeal.

{¶ 67} Similarly, the Eleventh District found that a trial court failed to state the full statutory language at sentencing; however, the "complete finding" appeared in the trial court's entry. *Ison*, 2025-Ohio-3193, at ¶ 46 (11th Dist.). The appellate court reaffirmed a prior holding, stating, "'[t]he trial court has no obligation . . . to engage in a word-for-word recitation of the language in the statute or to set forth its reasons to support its findings, as long as they are discernible in the record.'" *Id*., quoting *State v. Cozzone*, 2018-Ohio-2249, ¶ 27 (11th Dist.).

{¶ 68} In the present case, the record shows that the trial court was aware of Deaton's history of criminal conduct when it found that the public needed to be protected. Deaton was already on probation, and in that case the trial court had a PSI. The more recent offense was committed while Deaton was on probation, and the current probation violation was not the first such violation Deaton had committed. Deaton's trial counsel also acknowledged at sentencing, "The court's aware of his history in this court." The trial court had no obligation to state a reason for finding that the public needed protection.

{¶ 69} I cannot clearly and convincingly find that the record fails to support the trial court's findings under R.C. 2929.14(C)(4). There was no objection at sentencing to the consecutive sentences, and on appeal there is no argument that the record fails to support the trial court's findings. Therefore, considering the foregoing and because the trial court's imposition of consecutive sentences was not contrary to law, Deaton has failed to demonstrate error, plain or otherwise. Accordingly, because I agree with the majority on the other issues addressed but disagree with reversing on the consecutive sentence findings issue, I respectfully dissent from that portion of the majority opinion only. That is, rather than reversing any portion of the trial court's decision, I would instead affirm the trial court in all respects.

### J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, reversed as to sentencing only and is remanded for the limited purpose of resentencing according to law and consistent with the above Opinion. In all other respects, the judgment appealed from is affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 67% to appellant and 33% to appellee.

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*